# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

**DAVID WILLIAMS**                                                    **PLAINTIFF**
**ADC #78730**

### CASE NO.:5:05CV10 BD

**ANTHONY BRADLEY,** *et al.*                                        **DEFENDANTS**


## MEMORANDUM OPINION AND ORDER

Plaintiff David Williams, an inmate confined in the Arkansas Department of

Correction ("ADC") brings this action under 42 U.S.C. § 1983.  Plaintiff's Third

Amended Complaint (docket entry #174) alleges that Defendants: (1) violated Plaintiff's

right to adequate medical care, (2) subjected Plaintiff to unconstitutional conditions of

confinement by refusing to provide adequate clothing and apparel, (3) subjected Plaintiff

to strip searches in the presence of female guards, in violation of his Fourth and

Fourteenth Amendment rights, and (4) retaliated against Plaintiff for his use of the

grievance process.

Separate Defendant Sarah Speer has moved for summary judgment (docket entry

#182).  Plaintiff has responded (#193) and Defendant Speer has replied (#196).  For

reasons that follow, Defendant Speer's motion (#182) will be GRANTED and the claims

against Defendant Speer will be DISMISSED with prejudice.

Also pending is a motion for summary judgment filed by Separate Defendants

Bailey, Bradley, Clark, Evans, Gibson, Harmon, Hobbs, James, Mobley, Moncrief,

Norris, Toney, and Waddle ("ADC Defendants") (#186).  Plaintiff has responded to this

motion (#203), and Defendants have replied (#207).  For reasons that follow, the ADC

Defendants' motion (#186) also will be GRANTED.

## I.    Summary Judgment Standard:

Summary judgment is appropriate when there is no genuine issue of material fact,

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The Supreme Court has established guidelines to assist trial courts in determining whether

this standard has been met:

> The inquiry performed is the threshold inquiry of determining
> whether there is the need for a trial - whether, in other words,
> there are any genuine factual issues that properly can be
> resolved only by a finder of fact because they may reasonably
> be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  In

reviewing a motion for summary judgment, the Court must view the facts in a light most

favorable to the nonmoving party and give that party the benefit of all reasonable

inferences to be drawn from the record.  *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d

1076, 1077 (8th Cir. 1980).

The moving party bears the initial burden of identifying the evidence which it

believes demonstrates the absence of a genuine issue of material fact.  *Webb v. Lawrence

County*, 144 F.3d 1131, 1134 (8th Cir. 1998).  This burden may be discharged by showing

that there is an absence of evidence to support the non-moving party's case.  *Celotex

Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986).  Once the moving party

carries this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Inc. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). The judge does not weigh the evidence, but rather determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986).

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id*. at 249-250.

## II.   <u>Factual Background</u>:

Plaintiff is an inmate housed in the Maximum Security Unit ("MSU") of the ADC. He is serving a life sentence for murdering three of his family members. (Ex. A, 2-3, 24-25) Since his incarceration, he has been involved in the murder and stabbing of two fellow inmates, using a contraband knife obtained from within the prison. (Ex. A, 4, 19-20)

3

The Third Amended Complaint[1] alleges that the Defendants: (1) violated Plaintiff's right to adequate medical care; (2) subjected Plaintiff to unconstitutional conditions of confinement by refusing to provide adequate clothing and apparel, (3) subjected Plaintiff to cross-gender strip searches in violation of his Fourth and Fourteenth Amendment rights, and (4) retaliated against Plaintiff for his use of the grievance process.

Plaintiff also states that "defendants violated Williams's Fourteenth Amendment right to due process in disciplinary hearings [and] defendants violated Williams's First, Sixth and Fourteenth Amendment rights to access to the courts."  (#174, ¶ 1)  Plaintiff does not mention either of these issues again in his complaint.  This one sentence in the preliminary statement is insufficient to state claims against any of the named Defendants. Regardless, Plaintiff makes it clear that these issues are not separate claims, but instead refer to his retaliation claim (#204).

In addition, Plaintiff agrees with Defendants that the official capacity claims for money damages should be dismissed and that any potential Due Process claim regarding assignment to Administrative Segregation is barred (#204).  Insofar as Plaintiff raises

---

[1]The parties dispute what claims are now before the Court (#196, 203, 204).  To clarify, Plaintiff's Third Amended Complaint (#174) is the operative legal document raising the current claims against the Defendants.  "[A]n amended complaint supercedes an original complaint and renders the original complaint without legal effect." *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000).  Accordingly, Plaintiff's Third Amended Complaint (#174) determines what claims are before the Court.

these claims, they are dismissed with prejudice.  Accordingly, only the four claims stated in Plaintiff's Third Amended Complaint (#174) are before the Court.

During his incarceration at the ADC, Plaintiff has had several medical conditions that required the issuance of Special Medical Authorizations, commonly called "scripts". Scripts are generally issued for a set period of time, after which the inmate is re-evaluated to determine continued need for the script.

Defendant Speer was the Health Service Administrator ("HSA") for the MSU at all the times relevant to this action.  As HSA, Defendant Speer could not issue or void scripts.  She was, however, responsible for following up on physician referrals and script orders.

The ADC Defendants do not make medical decisions or treat inmates' medical issues (#188, ¶ 77).  Correctional Medical Services ("CMS") provides medical care and treatment for ADC inmates (#188, ¶ 78).  None of the CMS physicians who provided medical care to Plaintiff are Defendants in this action.  Defendant Mobley is the Deputy Director of Health and Treatment for the ADC.  He does not, however, supervise CMS medical personnel (#188, ¶ 79).  If ADC personnel have an issue with an inmate's script, ADC personnel will discuss the issue with medical personnel (#188, ¶ 81).  ADC and medical personnel then attempt to develop an alternate course of action commensurate with the inmate's medical needs.  (#188, ¶ 83).  Only physicians and practitioners, however, may issue or void a script (#188, ¶ 84).

5

III.   **Discussion**:

A.   **Plaintiff's Right to Adequate Medical Care:**[2]

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a federally protected right and show that the alleged deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250 (1988). In this case, Plaintiff alleges a violation of his Eighth Amendment rights.

The Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate food, clothing, shelter, and medical care.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970 (1994).  Prison officials or their agents violate the Eighth Amendment if they commit "acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285 (1976).  A serious medical need is one that is "either obvious to the layperson or supported by medical evidence."  *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir.1995).

The Court of Appeals for the Eighth Circuit Court has interpreted the applicable standard as including both an objective and a subjective component:  "The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and

_____

[2] A claim of deliberate indifference to a prisoner's serious medical needs is a subcategory of "conditions of confinement" claims such as the claim discussed in Section "B" *infra*.  *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir.1995).  Because the legal standards between the two claims differ, the claims are discussed separately.

(2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).  "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."  *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995); see also *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 2000) (holding that an inmate's disagreement or displeasure with his course of treatment is not actionable under § 1983).

The ADC has a practice of handcuffing all inmates from the back (#188, ¶ 72).  Plaintiff alleges that he had a serious injury to his right shoulder that made it painful to put his right arm behind his back for handcuffing.  Therefore, when Plaintiff was cuffed from behind, two sets of handcuffs were used to minimize the tension on his shoulder.  Defendants have provided medical evidence showing that Plaintiff may have experienced some discomfort from the use of two sets of handcuffs behind Plaintiff's back, instead of one set of handcuffs in front.  Plaintiff has admitted the accuracy of most of this evidence and declined to present any evidence to the contrary (#205).

The record shows that Plaintiff had a script for back cuffing, using two sets of cuffs, since at least 1999 (#189, Ex. N).  On December 10, 1999, Plaintiff's script was altered to "cuff in back with 2 sets of cuffs, or cuff in front" (#189, Ex. N, p.2).  On April 9, 2001, Plaintiff was able to work out and exercise his shoulder, although he complained

about wearing cuffs in the back.  Dr. Michael Young instructed Plaintiff that he should increase the range of motion in his shoulder with exercise. (#205, ¶ 87).

On May 21, 2001, Plaintiff was seen again by Dr. Young regarding several complaints, including shoulder pain.  After an x-ray, Dr. Young determined that Plaintiff's shoulder was "normal."  Dr. Young assessed Plaintiff with "chronic pain" without findings (#205, ¶ 88).  Although Dr. Young determined that Plaintiff's complaints about his shoulder were "unsubstantiated," he provided Plaintiff with a script for double cuffing in back (#205, ¶ 89).  Dr. Young did not, however, include the "or cuff in front" option in Plaintiff's script (#189, Ex. N, p. 5).  Based on Plaintiff's subjective complaints, however, his front-cuff script was renewed on October 19, 2001. (#205, ¶ 91)

In early 2002, Defendant Bradley discussed Plaintiff's front cuff script with Defendant Speer.  Plaintiff's front cuff script was then changed back to a double cuff in back script on January 31, 2002 (#189, Ex. N, p. 7).  On February 14, 2002, medical personnel saw Plaintiff again regarding his request for a script allowing him to be cuffed in the front.  The medical assessment found that Plaintiff was not in any distress, but was obese.  There were "no other remarkable findings," and Plaintiff was advised to take up his request with the ADC because the front cuffing was a security issue, not a medical issue (#205, ¶ 92).

On August 20, 2002, Dr. Roland Anderson saw Plaintiff regarding his request for a front cuff script.  The objective assessment showed "no deformity" and "good strength."

There was "no obvious pathology" (#205, ¶ 94).[3]  On October 18, 2002, Plaintiff's medical records indicate that there was "no gross pathology," and double cuffing in back was approved (#205, ¶ 95).  At another examination on October 30, 2002, progress notes state that Plaintiff's shoulder showed no deformity, and that he had good upper body strength and muscle mass indicating active use of his shoulder.  Due to his obesity, however, single cuffing in the back could cause some discomfort, so Plaintiff was given a script for double cuffs in back (#205, ¶ 96).

On May 6, 2003, Plaintiff's medications were refilled, although it was noted that no medical findings justified refilling medications and that Plaintiff's main problem was morbid obesity (#205, ¶ 99).  On October 15, 2003, Plaintiff's medical progress report again states that there was no evidence that he needed a front cuff script (#205, ¶ 100).

On October 28, 2003, Dr. Anderson stated that Plaintiff should be cuffed with two sets of cuffs in the back or one set of cuffs if cuffed in the front (#205, ¶ 101).  On the same day, APN Alexander issued Plaintiff a script for double cuffing in back or front cuffing.  This script was valid until October 28, 2004 (#189, Ex. N, p. 9).

On November 1, 2004, ANP Connie Hubbard issued Plaintiff a front cuff script. (#205, ¶ 104).  There are no corresponding medical notes relating to the issuance of this script (#205, ¶ 104).  On January 7, 2005, Plaintiff filed this action (#1).  Plaintiff's front

---

[3]Plaintiff states that Dr. Cagle made these findings, not Dr. Anderson.  Plaintiff does not, however, dispute the findings themselves

cuff script was renewed on October 31, 2005, and on October 23, 2006, again without corresponding medical notes (#189, Ex. N, p. 11-12).

On November 23, 2006, an unnamed officer double cuffed Plaintiff in the back during a cell search, allegedly based on Defendant Harmon's orders (#174, ¶ 27). Plaintiff states he dislocated his shoulder during this incident (#174, ¶ 28).  On December 18, 2006, one month before the expiration of Plaintiff's front cuff script, Dr. Richard Clark issued Plaintiff a double cuff in back script (#189, Ex. N, p. 13).  As with the scripts dating back to November 1, 2004, there are no corresponding medical notes with this script.

On June 6, 2007, Plaintiff saw Dr. John Lytle at the South Arkansas Orthopedic Center in Pine Bluff, Arkansas (#189, Ex. P).  Dr. Lytle opined that Plaintiff could not "comfortably get his arm up to the small of his back because of the stiffness" (#189, Ex. P).  Dr. Lytle stated that handcuffing Plaintiff in back would put Plaintiff in a significant position of discomfort and that he should instead be cuffed in front (#189, Ex. P).  It is unclear from the record whether Dr. Lytle's assessment of the discomfort from back cuffing included the use of two sets of cuffs or just one.

Based on the undisputed evidence in the record, Plaintiff has failed to show that any of the Defendants were deliberately indifferent to a serious medical need relating to hand cuffs.  While Plaintiff no doubt suffered discomfort from double cuffing in the back, routine discomfort is "part of the penalty that criminal offenders pay for their offenses

against society." *Hudson v. McMillian* 503 U.S. 1, 9, 112 S.Ct. 995, 1000 (1992)

(quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399 (1981)).

Plaintiff has the burden of proving deliberate indifference to his objectively serious

medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285 (1976).  Based on the

undisputed record, Plaintiff cannot make this showing.  Until Dr. Lytle's opinion in 2007,

the need for front cuffing, as opposed to Plaintiff's preference for front cuffing, was

neither obvious to the layperson nor supported by medical evidence.  See *Aswegan v.*

*Henry*, 49 F.3d 461, 464 (8th Cir.1995) (defining "serious medical need").  Until June 6,

2007, no medical provider articulated a need for front cuffing.  Plaintiff admits that his

front cuff script was renewed in 2001 based solely on his subjective complaints (#205, ¶

91).  Serious medical need, however, requires an objective, rather than a subjective,

showing.  *Dulany*, 132 F.3d at 1239.

Plaintiff argues that the fact a front cuff script was written is sufficient evidence to

show a serious medical need (#204, p. 10).  This is not so, for precisely the reason

highlighted by Plaintiff.  "Serious medical need" is a legal, not a medical, standard (#205,

¶ 108, p. 25).  Thus, according to Plaintiff's own argument, the issuance of a script alone

does not satisfy the applicable standard – especially when, as in this case, three separate

doctors examined Plaintiff's shoulder but could not substantiate Plaintiff's subjective

complaints.  Drs. Young, Anderson, Cagle and Clark[4] all determined that Plaintiff did not

---

[4] Dr. Clark issued a double back cuff script without examining Plaintiff.

11

require front cuffing.  None of these doctors are defendants in this case.  Plaintiff does not allege that these doctors falsified his medical records.  Based on this record, Plaintiff's argument is that the Defendants were aware of a medical need that the doctors were not aware of.  Of the four doctors who examined Plaintiff, only Dr. Lytle found a medical need for front cuffing.  This finding occurred long after the alleged deliberate indifference occurred in this case.  It should also be noted that none of the doctors prescribed any treatment for Plaintiff's shoulder, beyond recommending that he lose weight and exercise to increase range of motion.

Defendants have carried their burden by establishing the absence of a serious medical need during the relevant time period, or at minimum, that Defendants were not aware of a serious medical need during the relevant time period.  After this showing, Plaintiff was obligated to meet proof with proof.  *Matsushita Elec. Inc. Co.*, 475 U.S. at 587.  He did not.  Accordingly, Defendants are entitled to summary judgment on this claim.

### B.  <u>Unconstitutional Conditions of Confinement</u>:

Plaintiff alleges that Defendants Harmon and Bradley violated policies and procedures by failing to provide Plaintiff with appropriate clothing (#174, ¶ 34).  Specifically, Plaintiff alleges he was denied a coat in cold weather and denied a hat to protect his head from sunburn and blisters in sunny weather.  Plaintiff states that

Defendants' refusal to provide the requested apparel constituted deliberate indifference and cruel and unusual punishment (#174, ¶ 36).

Plaintiff's allegation that Defendants violated prison policy and procedure does not in itself state a claim. See *Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996) (noting that failure to follow prison policy does not in itself state a claim). Plaintiff must show, instead, that he suffered extreme deprivations in order to state a conditions-of-confinement claim. *Hudson*, 503 U.S. at 9. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991)). Plaintiff's allegations fall short of the required showing.

Plaintiff was housed in Administrative Segregation during the time relevant to this action. Inmates in Administrative Segregation are allowed one hour of yard call per day. On occasion, Administrative Segregation inmates spend up to three hours outside during yard call when inmates on work assignment are coming and going.

All inmates are provided shirts, pants, boxer shorts, socks, thermal tops, and thermal bottoms (#189, Exs. JJ, OO, LL). Administrative Segregation inmates are not assigned coats. When the weather is cold, however, "community coats" are offered for inmates who wish to wear a coat during yard call (#189, Ex. KK). On at least two occasions, Defendant Bradley denied Plaintiff's request for a coat (#205, ¶ 140). On both occasions, Defendant Bailey (Defendant Bradley's supervisor) overruled Defendant

13

Bradley and ordered him to make coats available when requested (#189, Ex. KK).

Defendant Bailey instructed Defendant Bradley that if it was cold enough for Bradley to

wear a coat, he had to make the community coats available to the inmates (#189, Ex. KK).

It is undisputed that Plaintiff was denied a coat for at least a short period of time.

Plaintiff does not, however, allege any injury as a result of his temporary chill.  "Because

a § 1983 action is a type of tort claim, general principles of tort law require that a plaintiff

suffer some actual injury before he can receive compensation."  *Irving v. Dormire*, 519

F.3d 441, 448 (8th Cir. 2008) (citing *Carey v. Piphus*, 435 U.S. 247, 253-55, 98 S.Ct.

1042 (1978).  Accordingly, Plaintiff's claim regarding denial of a coat fails.

Turning to the second part of Plaintiff's claim, his limited exposure to the sun

without a hat is not the type of "extreme deprivation" required to prevail on a conditions-

of-confinement claim.  *Hudson*, 503 U.S. at 9.  Prolonged, unnecessary exposure to the

sun may violate the Eighth Amendment.  *Hope v. Pelzer*, 536 U.S. 730, 738, 122 S.Ct.

2508 (2002).  Plaintiff must also show, however, that the exposure resulted in the

"wanton and unnecessary" infliction of pain prohibited by the Eighth Amendment.  *Id.*

Plaintiff's limited exposure to the elements is insufficient to meet this standard.

Plaintiff also may show an Eighth Amendment violation by establishing an

existing serious medical need as required by *Estelle*, or by showing a substantial risk of

future harm as required by *Helling v. Whitney*, 509 U.S. 25, 113 S.Ct. 2475 (1993).  On

July 16, 2002, medical personnel saw Plaintiff regarding his request for a hat script for

14

yard call (#205, ¶ 93).  The medical assessment showed that Plaintiff had some pink skin

and freckles.  Scratch marks were observed on Plaintiff's neck.  After examination,

medical personnel denied Plaintiff's request for a hat script (#205, ¶ 93).  If this

constitutes an injury, it is best described as *de mimimis*.  See *Cummings v. Malone*, 995

F.2d 817, 822-23 (8th Cir.1993) (claims under the Eighth Amendment require a

compensable injury to be greater than *de minimis*).  The record shows that Plaintiff may

have suffered a minor sunburn because he was denied a hat script.  The record also shows

the absence of a serious medical need for the requested hat script.  Plaintiff has not put

forward any evidence to the contrary.  Accordingly, Plaintiff cannot make the showing

required by *Estelle*.  *Estelle*, 429 U.S. at 106.

Plaintiff also argues that repeated exposure to the sun exposed him to a significant

risk of skin cancer.  While exposing an inmate to a substantial risk of future harm may

violate the Eighth Amendment, *Helling*, 509 U.S. at 33, this "requires more than a

scientific and statistical inquiry into the seriousness of the potential harm and the

likelihood that such injury to health will actually be caused by exposure." *Id.* at 36.  The

Court must also assess:

> whether society considers the risk that the prisoner complains
> of to be so grave that it violates contemporary standards of
> decency to expose anyone unwillingly to such a risk.  In other
> words, the prisoner must show that the risk of which he
> complains is not one that today's society chooses to tolerate.

*Id.*

Exposure to the sun for one hour, or on occasion three hours, does not violate contemporary standards of decency.  Accordingly, Plaintiff's conditions-of-confinement claim fails as a matter of law.

### C. **Strip Searches:**

1.    *ADC Policy*

The ADC has a policy governing inmate searches (#205, ¶ 112).  The policy requires ADC officials to conduct body searches in a manner which will avoid unnecessary force, embarrassment, or indignity to the person being search (#205, ¶ 116).  Inmates in Administrative Segregation are strip searched routinely before going to and coming from yard call (#205, ¶ 123).  Inmates are not strip searched by guards of the opposite gender unless there is an emergency (#205, ¶ 124).  According to ADC policy, a female officer may be present or in the vicinity when routine strip searches of male inmates are conducted, but she will not perform the search (#205, ¶ 125).

When Administrative Segregation inmates, such as Plaintiff, are moved, two officers accompany the inmate (#205, ¶ 130).  Generally, this consists of one male and one female officer (#189, Ex. KK).  Defendant James testified that other female guards are sometimes in the area of the strip search while performing some other duty in the area (#189, Ex. LL).  He stated that female guards would not be within a few feet of the male inmates being strip searched (#189, Ex. LL).  Defendant James testified that he believed it

would be inappropriate for a female guard to be within a few feet of a male inmate while he is being strip searched (#189, Ex. LL).

Defendant Bailey testified, however, that female guards are routinely in the immediate area during strip searches of male inmates (#189, Ex. KK).  He stated that the female officers sometimes move back a few feet and turn away (#189, Ex. KK).  Defendant Bailey admits, however, that some female guards have not turned away during strip searches (#189, Ex. KK).  In addition, according to one Defendant, at least one female guard was known for making inappropriate remarks to naked inmates (#189, Ex. KK).  That guard, however, is not a Defendant in this action.

While opposite-sex pat searches do not violate an inmate's Constitutional rights, the more intrusive strip searches and body cavity searches require more scrutiny.  See *Timm v. Gunter*, 917 F.2d 1093 (8th Cir. 1990) (finding no right to be free from opposite-sex pat searches); but see *Watson v. Jones*, 980 F.2d 1165 (8th Cir. 1992) (distinguishing *Timm* based on the manner of the pat search).

2.      *Plaintiff's Claim*

Plaintiff does not complain about being strip searched in the presence of other inmates.  See *Franklin v. Lockhart*, 883 F.2d 654 (8th Cir. 1989) (holding that inmates have no right to be free from strip searches in the presence of other inmates).  Nor does he complain about emergency searches by female guards.  The strip searches Plaintiff

17

complains of are the routine, daily occurrences, with no exigent circumstances, in the presence of female officers.

    3.    *Qualified Immunity*

There is no dispute as to the policy of the ADC in conducting strip searches of inmates in Administrative Segregation.  Defendants contend that the policy is constitutional.  Even if the policy is found to be unconstitutional, Defendants assert that they are entitled to qualified immunity because the law was not clearly established at the time of the conduct at issue.

Qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  In deciding a motion for summary judgment based on qualified immunity, courts are instructed to use a two-step analysis.  Initially, the court must "resolve a 'threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry.'"  *Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151(2001).  "If the answer to that inquiry is yes, we next ask whether the constitutional right was clearly established at the time so that a reasonable officer would have

understood that his conduct violated that right." *Amrine v. Brooks*, 522 F.3d 823, 831

(8th Cir. 2008) (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151).

The Supreme Court has significantly narrowed the meaning of "clearly established

constitutional or statutory rights" in the context of qualified immunity.  Courts must

analyze a defendant's conduct "in light of the specific context of the case, not as a broad

general proposition." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.  "Thus, the Supreme

Court has directed that the lower courts not take too broad a view of what constitutes

clearly established law." *Hill v. McKinley,* 311 F.3d 899, 904 (8th Cir. 2002).  "Officials

are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."

*Davis v. Hall*, 375 F.3d 703, 712 (8th Cir.2004).  "This standard 'gives ample room for

mistaken judgments by protecting all but the plainly incompetent or those who knowingly

violate the law.'" *Stufflebeam v. Harris,* 521 F.3d 884, 888 -889 (8th Cir. 2008) (quoting

*Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534 (1991)).

   4.   *Did the Defendants Violate a Constitutional Right?*

Inmates inevitably lose many privacy rights as a result of their incarceration.  They

retain, however, a limited right to privacy.  Competing principles must be weighed when

searching for the proper balance between the right to some privacy and the need of prison

officials to search inmates for contraband – principles such as basic human decency, as

well as concerns for officer safety and equal employment opportunities for male and

female guards.  See, *e.g., Timm v. Gunter*, 917 F.2d 1093 (8th Cir.1990).

19

Clearly, inmates may be strip searched under certain circumstances.  It is equally clear that this kind of invasive search must be conducted in a "reasonable manner."  *Bell v. Wolfish*, 441 U.S. 520, 559-60, 99 S.Ct. 1861 (1979).  To say that a strip search must be conducted in a "reasonable manner," however, is the kind of broad general proposition that is of limited help in deciding a specific case.  There is no want of case law on the subject of searches of inmates and pretrial detainees.  This is an area of the law, however, where particularized facts make it difficult to articulate bright-line rules.

Many federal courts have focused on the intensely personal invasion of privacy that cross-gender strip searches implicate in our society.  See, *e.g.*, *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir.1981) (recognizing prisoner's constitutional right to some privacy and noting that "most people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating"); see also *Canedy v. Boardman*, 16 F.3d 183, 187 (7th Cir.1994) (cross-gender strip searches of inmates or regular exposure of nude inmates to guards of the opposite sex violates inmates' privacy rights).

It is clear that occasional or inadvertent sighting by female guards of nude male inmates does not violate the inmates' limited right of privacy.  But at some point, cross-gender inspection of naked inmates inches across the line and violates a prisoner's right to privacy.  "[T]hat right is violated where this observation is more intrusive (like a strip search, in the absence of an emergency) or a regular occurrence."  *Canedy*, 16 F.3d at 187

(citing *Cookish v. Powell*, 945 F.2d 441 (1st Cir.1991) (*per curiam*); *Forts v. Ward*, 621 F.2d 1210 (2d Cir.1980); *Lee v. Downs*, 641 F.2d 1117 (4th Cir.1981); *Kent v. Johnson*, 821 F.2d 1220 (6th Cir.1987); *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8th Cir. 1980), cert. denied, 446 U.S. 966, 100 S.Ct. 2942 (1980); *Timm v. Gunter*, 917 F.2d 1093 (8th Cir. 1990); *Grummett v. Rushen*, 779 F.2d 491 (9th Cir. 1985); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988); *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993); *Cumbey v. Meachum*, 684 F.2d 712 (10th Cir. 1982); *Hardin v. Stynchcomb*, 691 F.2d 1364 (11th Cir. 1982); *Bowling v. Enomato*, 514 F. Supp. 201 (N.D.Cal. 1981); *Robbins v. South*, 595 F. Supp. 785 (D.Mont. 1984); *Miles v. Bell*, 621 F. Supp. 51 (D.Conn. 1985); *Smith v. Chrans*, 629 F. Supp. 606 (C.D.Ill. 1986); and *Johnson v. Pennsylvania Bureau of Corrections*, 661 F. Supp. 425 (W.D.Pa. 1987)).[5]

The Court of Appeals for the Seventh Circuit aptly observed that, "one of the clearest forms of degradation in Western Society is to strip a person of his clothes.  The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy."  *Canedy*, 16 F.3d at 185 (citation omitted); see also *Richmond v. City of Brooklyn Center*,  490 F.3d 1002, 1010 (C.A.8 (Minn.),2007) (Smith, J., dissenting)("A

---

[5] Many of the cases string cited in *Canedy* do not reach the ultimate issue in this case, but instead provide guidance supporting the holding in *Canedy*.

strip search conducted with the utmost courtesy is nonetheless inherently humiliating and degrading."[6])

Other federal courts have focused on the limits of the right of privacy in the prison context.  In *Hill v. McKinley,* 311 F.3d 899 (8th Cir. 2002), the Court of Appeals for the Eighth Circuit noted that prisoners are entitled to "very narrow zones of privacy."  *Id.* at 904-05.  The *Hill* Court quoted *Johnson v. Phelan*, 69 F.3d 144, 146 (7th Cir.1995), with approval, a case in which the Court of Appeals for the Seventh Circuit held that cross-gender monitoring of naked prisoners was permissible, and that guards were "entitled to watch and regulate every detail of daily life."  *Hill*, 311 F.3d at 904-05.

Federal courts apply a rational relationship test for assessing the constitutionality of prison regulations and practices.  *Turner v. Safley*, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259-60 (1987).  The Plaintiff in this case admits to the validity of the strip search policy, but complains that the policy was not followed (#205, ¶112-35).  He alleges that female guards routinely remain in the immediate area where male inmates are being strip searched as they are escorted to and from the yard.  For purposes of deciding this motion, the Court will assume that this allegation is true.

Applying *Turner*, the Court must consider: (1) whether there is a valid, rational connection between the prison regulation or practice and a legitimate governmental interest; (2) whether the regulation or practice allows inmates an alternative means of

---

[6]*Richmond* involved the strip search of a pretrial detainee conducted in a motel room.

exercising the subject constitutional right; (3) the impact of accommodating the asserted right on guards, other inmates, and the allocation of resources generally; and (4) the absence of ready alternatives to the regulation or practice. *Id.* at 89-91, 107 S.Ct. at 2261-63.

The extent of a prisoner's right to privacy is inversely proportional to the threat he poses to guards and other inmates. There is an apparent and valid security reason to strip search inmates, such as the Plaintiff here, who are in Administrative Segregation in the Maximum Security Unit of the prison. As noted, this Plaintiff not only brutally killed three of his own family members, but also has been involved in the stabbing and killing of two inmates during his incarceration. The need to search this inmate requires no further explanation. Indeed, Plaintiff does not contest the fact that Defendants have a rational basis to strip search inmates who pose such a risk. There is no serious issue as to the ADC's rationale for assigning two guards to escort this category of inmates to and from the yard.

This does not end the inquiry. The question in this case is whether female guards should be permitted in the immediate vicinity of strip searches of male inmates. In other words, does the ADC have a rational basis for assigning women guards to escort male prisoners? There is a rational basis for such a policy. As the Court of Appeals noted in *Timm,* 917 F.2d at 1102, a same-sex rule for prison guards would significantly affect the cost of staffing, resources, and equal employment opportunities for women guards.

There is no allegation that female guards actually conduct the strip searches.  In fact, the record establishes that the ADC policy is that only male guards conduct strip searches of male inmates, absent exigent circumstances.  This is an accommodation of male prisoners' limited right of privacy.  In considering the impact of accommodating the Plaintiff's privacy rights on guards and the allocation of resources generally, the balance tilts in favor of Defendants.  As noted, it would present a significant burden on the ADC, in terms of both costs and allocation of guards, if a same-sex guards were mandated for prisoners in Administrative Segregation.  In addition, such a rule would burden females guards as well as applicants.  They would be inherently less desirable employees, because they would not be allowed to perform the full range of duties expected of prison guards.

The absence of ready alternatives militates in Defendants' favor, as well.  Strip searches of the most dangerous inmates is necessary for the safety of inmates and guards alike.  Likewise, the decision to assign two guards to escort this category of inmate is a reasonable security measure.  Any rule requiring that female guards not be present during these routine, daily searches would impose a burden on the prison and female guards that the law, quite simply, does not require.

None of this discussion, however, minimizes the settled rule that searches, and particularly strip searches and body-cavity searches, must be conducted in the least offensive manner possible.  Barring exigent circumstances, strip searches should be conducted by officers of the same sex as the individual searched.  *Richmond v. City of*

*Brooklyn Center*, 490 F.3d 1002, 1008 (8th Cir.  2007) (citing *Roberts v. Rhode Island*, 239 F.3d 107, 113 (1st Cir. 2001)).  Strip searches also must be performed in a fashion that minimizes the inherently degrading and humiliating nature of such searches.  *Id.* (citing *Seltzer-Bey v. Delo*, 66 F.3d 961, 963-63 (8th Cir. 1995).  In *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), the Eighth Circuit found a constitutional violation when a stripped detainee was subjected to prolonged exposure to officers of the opposite sex. *Hill* is sometimes cited for the proposition that cross-gender strip searches do not violate the constitution.  This is a misreading of the holding in *Hill*.  In *Hill*, the Court of Appeals explicitly found a constitutional violation, but granted qualified immunity because, until that case, the detainee's right was not "clearly established."  *Hill*, 311 F.3d at 904.

While *Hill* involved a detainee, not an inmate, this holding, together with numerous other cases, place Defendants on notice that any intentionally degrading conduct during a strip search, including derisive speech intended to humiliate inmates, violates a prisoner's limited right of privacy.  As noted above, the female guard identified in discovery as someone who allegedly made degrading remarks during strip searches of male inmates is not a party to this lawsuit.  Had she been named, the outcome of the current motion might well have been different.

Under the undisputed facts alleged in this lawsuit and the law in this Circuit, Defendants have not violated Plaintiff's constitutional right to privacy.  There is no

25

reason, therefore, to discuss the second prong of the test for qualified immunity, *i.e.*, whether the law was clearly established.

### D. __Retaliation for Use of the Grievance Process__:

Plaintiff also alleges that, in retaliation for his use of the grievance process, Defendants reduced his status to Administrative Segregation, transferred him, filed false discipline reports against him, and denied him adequate medical care and conditions of confinement (#174).  As a matter of law, Plaintiff was not denied adequate medical care or constitutional conditions of confinement.

Furthermore, Plaintiff cannot establish that the Defendants reduced his status to Administrative Segregation in retaliation for his filing the grievances at issue in this case. Plaintiff had been housed in Administrative Segregation for years before the conduct he now complains of.  Accordingly, he cannot show that filing grievances was a motivating factor for his placement in Administrative Segregation.  He does state that the false disciplines may have an impact on his continued confinement to Administrative Segregation.  His continued placement in Administrative Segregation, however, is the subject of a separate lawsuit.  *Williams v. Norris, et al.*, 2008 WL 2003319 (8th Cir. filed May 12, 2008).  Thus, the claims remaining for consideration are Plaintiff's retaliatory transfer and discipline claims.

Defendants have provided legitimate, non-retaliatory reasons for Plaintiff's transfers (#205, ¶ 172-89).  Plaintiff has failed to provide any evidence to the contrary.

Accordingly, the retaliatory transfer claim cannot survive.  See *Goff v. Burton*, 91 F.3d 1188, 1191 (8th Cir. 1996) (holding that inmate must show that but for his exercise of a constitutional right, he would not have been transferred).

Turning to the discipline claim, to make a *prima facie* case, Plaintiff must show that: (1) he exercised a constitutionally protected right; (2) prison officials disciplined him; and (3) his exercise of a protected right was the motivation for the discipline.  *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007).  Plaintiff bears a heavy evidentiary burden to establish a *prima facie* case.  *Id.* (citing *Murphy v. Mo. Dept. of Corr.*, 769 F.2d 502, 503 n.1 (8th Cir. 1985))  He cannot merely allege that an act was retaliatory.  *Id.* (citing *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir.1985)).  Defendants have shown that the disciplinary measures in question were supported by officer reports (#205, ¶ 154, 163).

In this case, Plaintiff does little more than deny Defendants assertions and allege that the disciplines were, in fact, retaliatory.  A retaliation claim is precluded if punishment was imposed based on an actual violation of prison rules and Defendants show "some evidence" that the inmate actually committed the alleged rule violation.  *Earnest v. Courtney*, 64 F.3d 365, 367 (8th Cir.1995) (*per curiam*).  Plaintiff has failed to present any triable issue of fact regarding his discipline.  Accordingly, this claim must be dismissed.

**IV.**    <u>**Conclusion**</u>**:**

For the reasons stated, Separate Defendant Sarah Speer's Motion for Summary Judgment (#182) is GRANTED.  The ADC Defendants' Motion for Summary Judgment (#186) also is GRANTED.   Accordingly, all claims are hereby DISMISSED with prejudice.

IT IS SO ORDERED this 29th day of July, 2008.

_____

UNITED STATES MAGISTRATE JUDGE

28